NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0072n.06

No. 21-5273

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Feb 06, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| ROBERT CHRISTOPHER ENGLAND, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

Before: BATCHELDER, WHITE, and MURPHY, Circuit Judges.

WHITE, J., delivered the opinion of the court in which BATCHELDER and MURPHY, JJ., joined. MURPHY, J. (pp. 38–40), delivered a separate concurring opinion.

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Robert England appeals the denial of his motions to suppress the fruits of a search of his work-issued laptop and to dismiss a count of the superseding indictment charging him with possession of child pornography. He also challenges his sentence, arguing that various Sentencing Guideline provisions were improperly scored and that his sentence is substantively unreasonable. We **AFFIRM**.

**I.**

**A.**

Robert Chris England ("England") was employed as a firefighter by the Middlesboro Fire Department. His father, Robert England ("Chief England"), was the chief officer of the fire department at times relevant to this appeal. In early 2017, Chief England promoted England and two other firefighters, Troy Perry and Rick Evans, to the rank of lieutenant, and assigned each a

laptop labeled with the name of the lieutenant to whom it was assigned. However, the lieutenants were told that all firefighters could use the laptops for continuing education, fire training, and other uses.

By all accounts, England treated his laptop somewhat differently than did the other lieutenants. For example, Lieutenant Evans took his laptop home with him and brought it back the next work day. When at work, he left it on his desk the entire day and let others use it as needed. Lieutenant Perry mostly left his laptop sitting out in the office reserved for lieutenants. Like Lieutenant Evans, England took his laptop home with him and brought it back the next work day. However, colleagues of England recalled that he was "usually always in the office on the computer," R.288, PID 3045, and that "[i]t was always with him. If it was in the office and he left the office, the door was locked. He always took it home. Just always in his possession," R.289, PID 3405–06. Additionally, unlike the laptops assigned to the other lieutenants, England's laptop was not made generally available for use by others. England was also the only lieutenant who kept his laptop password-protected. England was occasionally seen plugging an external hard drive into his laptop.

In June 2018, local law-enforcement officials began an investigation into allegations that England exposed himself to a minor ("Minor A") at a Walmart store in Middlesboro. On the morning of June 23, 2018, at the police station located across the street from the fire station, Floyd Patterson, an officer with the Middlesboro Police Department, interviewed England about the allegations. The interview lasted approximately ten minutes and ended around 9:48 a.m. When the interview ended, England returned to the fire department, where Jonathan Farmer, a colleague of England's, observed him walk directly to the lieutenant's office, where he "went to the computer . . . acting frantic, like, on the computer. Like moving his fingers." R.287, PID 2976.

Farmer observed England for approximately 30 to 45 seconds, after which England loaded the laptop into a black bag and went home, where he lived with Chief England.

Believing that England was deleting incriminating materials from his laptop, Farmer sent a text message to his friend, State Trooper George Howard, informing him of what he had seen. After receiving the text message from Farmer, and approximately twenty minutes after England left the interview with Patterson, Howard called Patterson and advised him that England was visibly nervous after leaving the police department and appeared to be deleting materials from his laptop. In response to Howard's phone call, Patterson called Officer Jeremiah Johnson and asked him to call Chief England. When Patterson learned that the laptop belonged to the city, he directed Johnson to ask Chief England to bring the laptop to the police station.

Johnson called Chief England at approximately 10:30 a.m. Chief England agreed to bring the laptop and arrived at the police station at approximately 12:30 p.m. Patterson informed Chief England about the allegations against England and asked for Chief England's consent to search the laptop, noting that the laptop belonged to the city. Chief England agreed and signed a consent form. The mayor of Middlesboro subsequently signed a form consenting to the search of the laptop as well, but the date on which he did so is unclear. Patterson and Johnson never asked England for his consent. The laptop was sent to the Kentucky State Police for a forensic examination.

The forensic examination revealed that England's laptop contained 630 images of child pornography, including depictions of sadistic or masochistic conduct, such as the anal penetration of a toddler. The examination also revealed that an external hard drive containing folders with names indicating that they contained child pornography had been connected to the laptop; that the laptop had been used to access the Tor Browser, which allows the user to browse the internet anonymously, including "dark web" sites that are not indexed by regular search engines; and that

CCleaner, a data-cleaning software found on the laptop, was manually run 333 times, including at 9:48 a.m. on June 23, 2018. All of the settings on CCleaner were set to default except the "Autocomplete Form History" option, and it was not set to run automatically.

By the time the Kentucky State Police received the laptop, many images were in deleted or "unallocated space" on the computer and their data "carved," or removed. Some images, however, were in "allocated space" in the cache of a program called ManyCam that enhances the functionality of videoconferencing tools.

**B.**

A federal grand jury returned an indictment charging England with three counts of receiving a visual depiction of a minor engaged in sexually explicit conduct, on May 13, 2018, May 27, 2018, and June 11, 2018, respectively, in violation of 18 U.S.C. § 2252(a)(2). Each count contained a description of the image of child pornography underlying the count. A federal grand jury later issued a superseding indictment charging England with an additional count of possessing a laptop containing visual depictions of a minor engaged in sexually explicit conduct from approximately April 2017 to June 23, 2018, in violation of 18 U.S.C. § 2252(a)(4)(B).

England filed a motion to suppress the images discovered on the laptop, arguing that the seizure and search of his laptop without a warrant was not supported by any valid exception to the Fourth Amendment's warrant requirement. As relevant here, England argued that neither Chief England nor the mayor had actual authority to consent to the search because they did not have mutual use or joint access or control of the laptop. England also argued that Chief England and the mayor lacked apparent authority to consent to the search and that no reasonable officer could rely on the fact that the city owned the laptop in seeking their consent to the search. At the very

least, England contended, the circumstances confronting the officers were sufficiently ambiguous that they were required to inquire further before seizing and searching the laptop.

The government opposed the motion, and the magistrate judge held an evidentiary hearing and issued a recommendation that the motion be denied. England objected, and the district court overruled his objections and adopted the magistrate judge's recommended disposition as its own. The district court found that Chief England had both actual and apparent authority to consent to the search of the laptop.

Before trial, the government filed a notice of its intent to introduce evidence, pursuant to Rule 414 of the Federal Rules of Evidence, that England had committed acts of child molestation during the period in which the charged offenses were alleged to have occurred. In particular, the government advised of its intent to introduce evidence that England: (1) masturbated in front of a 10-year-old boy ("Minor A") in a public restroom at a Walmart store; (2) sexually abused a 6- or 7-year-old boy ("Minor B") approximately twenty times; and (3) took photographs of two or three boys who were around twelve years of age in their underwear ("Minors C"). England filed separate motions *in limine* to exclude all evidence concerning Minors A, B, and C, and the district court held a hearing on the motions.

The district court granted the motion in part and denied it in part as to Minor A, ruling that the government could only introduce evidence "of the fact that Defendant was briefly interviewed on June 23, 2018 at 9:38 a.m. by an officer of the Middlesboro Police Department regarding an unrelated incident involving allegations against Defendant involving a minor male." R.200, PID 1624–25. The district court denied England's motion *in limine* as to Minor B, allowing the introduction of testimony from Minor B himself but excluding testimony from England's

colleagues supporting Minor B's allegations. Finally, the district court granted the motion *in limine* as to Minors C.

After a five-day trial, the jury returned guilty verdicts on all four counts. England then filed a motion to dismiss Count 4 of the superseding indictment—charging possession of a laptop containing visual depictions of a minor engaged in sexually explicit conduct—arguing that punishing him for that offense would violate the Double Jeopardy Clause of the Fifth Amendment. Specifically, he argued that he could not be convicted of both possessing and receiving child pornography; that the superseding indictment, jury instructions, and verdict form did not specify the particular media, conduct, or images underlying Count 4; and that the timeframe of the other three counts fell within the timeframe of Count 4. The district court denied the motion at sentencing, finding that "both the indictment and the record" showed that "separate images and separate conduct . . . undergird[] each count of conviction." R.292, PID 3823.

The Probation Office calculated England's total offense level as 42. That calculation included an enhancement pursuant to U.S.S.G. § 2G2.2(b)(5), which provides for a five-level increase "[i]f the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." U.S.S.G. § 2G2.2(b)(5). According to the presentence report, "defendant sexually abused or exploited Minor B on multiple occasions." R.265, PID 2253. The total offense level also included a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 on the ground that "England made a calculated and purposeful attempt to delete images from his laptop" after being questioned by Patterson on June 23, 2018. *Id.*, PID 2252. Further, the Probation Office declined to recommend a two-level reduction under U.S.S.G. § 2G2.2(b)(1), which applies when "the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor," U.S.S.G. § 2G2.2(b)(1), or a reduction for

acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. Based on England's total offense level of 42 and criminal-history category of I, the Probation Office recommended a Guidelines imprisonment range of 360 months to 960 months.[1]

England objected to the PSR. As relevant here, he again argued that Count 4 of the superseding indictment should be dismissed. He also argued that he was entitled to the two-level reduction under § 2G2.2(b)(1); that the five-level enhancement under § 2G2.2(b)(5) was improper; and that the two-level enhancement for obstruction of justice did not apply. The district court rejected these arguments at sentencing and calculated a total offense level of 42, a criminal history category of I, and a Guidelines imprisonment range of 360–960 months. It then granted England a two-point variance in his total offense level because the five-level enhancement he received and two-level decrease he was denied for the alleged conduct with Minor B, in the court's view, "really, really overstates or—or double counts, I think, the harm that happened there." R.292, PID 3890–91. Additionally, the court observed that the 630 images of child pornography attributed to England were only slightly above the 600 images necessary to receive a five-level enhancement under the Guidelines. The district court sentenced England to consecutive terms of 60 months each on Counts 1 through 3 and 120 months on Count 4, followed by twenty years of supervised release.

## II.

We first address England's argument that the district court erred in denying his motion to suppress the evidence obtained from his laptop. When reviewing the denial of a motion to suppress, we review a district court's factual findings for clear error and its conclusions of law de

---

[1] The original Guidelines range as calculated was 360 months to life. But because the statutorily authorized maximum sentence of 960 months is less than the maximum of the Guidelines range, the Guidelines range was revised to 360–960 months' imprisonment pursuant to U.S.S.G. § 5G1.2(b).

novo. *United States v. Bateman*, 945 F.3d 997, 1004–05 (6th Cir. 2019) (internal quotation marks omitted). "When the district court has denied the motion to suppress, we review all evidence in a light most favorable to the Government." *United States v. Gilbert*, 952 F.3d 759, 762 (6th Cir. 2020) (quoting *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006)). We will affirm the denial of a motion to suppress "if the district court's conclusion can be justified for any reason." *United States v. May-Shaw*, 955 F.3d 563, 566 (6th Cir. 2020) (quoting *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019)).

**A.**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "A search conducted without a warrant is per se unreasonable unless it falls within a specific exception to the warrant requirement." *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020) (internal citation and quotation marks omitted). One exception to the warrant requirement applies "to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or 'from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007) (internal citation omitted; quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

Common authority is derived not from a mere property interest in the object or area to be searched, but rather from "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the [property] to be searched." *Matlock*, 415 U.S. at 171 n.7.

Even if a third party lacks actual authority to consent to a search, the Fourth Amendment is not violated "if the police relied in good faith on a third party's apparent authority to consent to the search." *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004); *United States v. Purcell*, 526 F.3d 953, 963 (6th Cir. 2008) (quoting *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006)). "The government bears the burden of establishing the effectiveness of a third party's consent." *United States v. Waller*, 426 F.3d 838, 845 (6th Cir. 2005); *see United States v. Taylor*, 600 F.3d 678, 681 (6th Cir. 2010).

"Apparent authority exists when 'the facts available to the officer at the moment' would lead a reasonable officer to believe that a party had actual authority." *United States v. Sheckles*, 996 F.3d 330, 349 (6th Cir. 2021) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). We judge apparent authority against an objective standard, *Purcell*, 526 F.3d at 963, looking to the facts that were available to the police when the search began, *Morgan*, 435 F.3d at 664. "If apparent authority existed at th[e] time, later-discovered facts that might undermine the initial reasonable conclusion of third-party apparent authority are generally immaterial." *Id.* No apparent authority exists "if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry." *Waller*, 426 F.3d at 846 (quoting *United States v. McCoy*, Nos. 97-6485, 97-6486, 97-6488, 1999 WL 357749, at *10 (6th Cir. May 12, 1999) (Clay, J., concurring in part and dissenting in part)). "Where the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property," a search without a warrant is unlawful. *Id.*

**B.**

We need not determine whether Chief England had actual authority to consent to the laptop search because we are satisfied that he had apparent authority to do so. In holding that Chief England had apparent authority to consent to the laptop search, the district court observed:

> [T]he laptop belonged to the fire department (not [England]); Chief England was the highest ranking officer at the fire department, and this status suggested that he had control of the laptop; this control was demonstrated when Chief England requested his subordinate ([England]) to return the laptop to him and [England] complied; and the Chief executed a consent form for the express purpose of conducting a search, never giving officers any indication that he lacked authority to do so.

R.121, PID 1138.

England argues that this conclusion is not reasonable because Chief England was not on duty and he was at his residence. But England does not explain why Chief England's being off duty and at his residence would suggest that he did not have authority to consent to the search and we decline to make an argument for him.

England further argues that it is unreasonable to conclude that Chief England had apparent authority to consent to the search because he assigned the laptop to England, who maintained exclusive control over it. This may be true in the abstract, but there is no indication that the officers were aware that England was the near-exclusive user of the laptop and that Chief England himself did not use the laptop. During the suppression hearing, Patterson testified that he was "not aware of all that" when asked whether people told him "that [England] used [the laptop] exclusively and kept it with him the whole time[.]" R.97, PID 740. Rather, Patterson testified that when he went to the fire department after interviewing England, he "asked [the other firefighters] if [the laptop] was [England's] or not, and they said it belonged to the city." *Id.*, PID 752. Patterson then called Johnson, who asked Chief England to bring the laptop to the police station, and Chief England

-10-

promptly did so. And, when asked whether he recalled seeing the sticker with England's name on the laptop, Patterson answered, "I don't recall the sticker." *Id.*, PID 741. Patterson additionally testified that Chief England "specifically told [Patterson and Johnson] [that] [they were] not going to find anything on there" and that "the only thing [they] would possibly find on [the laptop] is some sites, maybe they went to look at [automatic rifles]." *Id.*, PID 753–54. Patterson could reasonably infer from Chief England's asserted knowledge of what was and was not on the laptop that Chief England used the laptop. Under "the totality of the circumstances," a reasonable officer, with the facts available to Patterson and Johnson, would have reasonably believed that Chief England had authority to consent to the search based on facts beyond the city's ownership or Chief England's ultimate control of the laptop. *See United States v. Campbell*, 317 F.3d 597, 608 (6th Cir. 2003).

England further argues that the officers were presented with an "ambiguous situation" such that "they should have clarified whether there was mutual use, access, or control of the laptop by other members of the department." Appellant Br. at 48 (citing *Waller*, 426 F.3d at 845). In *Waller*, we held that law enforcement officers lacked apparent—and actual—authority to conduct a search of the defendant's luggage where "the circumstances made it unclear whether [the defendant]'s luggage bag was 'subject to "mutual use" by'" a third party. 426 F.3d at 847. In so holding, we observed that although an officer could have "reasonably believed that [the third party] exhibited some level of control over the luggage, *common authority rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'*" *Id.* at 848–49 (emphasis added) (quoting *Matlock*, 415 U.S. at 171 n.7). The officers in *Waller* "did not ask any questions to determine whether [the third party] had 'mutual use' of the luggage." *Id.* at 849.

The district court rejected England's reliance on *Waller*, commenting that "the totality of what the officers knew at the time" justified their reliance on Chief England's apparent authority to consent to the search. R.121, PID 1138. It found England's reliance on *Waller* misplaced because "here there were no circumstances raising doubt about Chief England's authority to consent." *Id.* We agree that under the circumstances presented, the facts available to Patterson and Johnson did not suggest that Chief England did *not* have mutual use of the laptop. As discussed above, Patterson was not aware that England had near-exclusive use of the laptop, and when he asked the firefighters whether the laptop was England's, they said no. Additionally, Chief England's comment to Patterson that "his son does use [the laptop] and he takes it home with him, and [that] he . . . sometimes . . . forgets it and leaves it at the fire department," R.97, PID 740, as well as his comment about what Patterson would and would not find on the laptop, *id.*, PID 753–54, did not indicate that Chief England did *not* have mutual use of the laptop either.

Finally, England argues that the officers did not proceed in good faith in seeking Chief England's consent because they later sought consent for the search from Mayor Kelley. But this fact has no bearing on whether a reasonable officer would have believed at the time that Chief England had authority to consent to the search. Moreover, to the extent that the officers later had doubts as to whether Chief England could validly consent, we look only to the facts that were available to the officers when they began their search. *See Morgan*, 435 F.3d at 664.

Accordingly, we conclude that Chief England had apparent authority to consent to the search of the laptop.

**III.**

England next argues that the district court abused its discretion by admitting Minor B's testimony because its probative value was substantially outweighed by its prejudicial effect, the

district court had an insufficient basis to conclude that England engaged in the alleged conduct, and the alleged conduct did not amount to child molestation. We find no abuse of discretion in the district court's evidentiary rulings.

We generally review a district court's evidentiary determinations for an abuse of discretion. *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012). We will find reversible error only if we are "left with the definite and firm conviction that the district court committed a clear error of judgment." *United States v. Hruby*, 19 F.4th 963, 966 (6th Cir. 2021) (quoting *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005)). A district court abuses its discretion when it "applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *United States v. Fowler*, 819 F.3d 298, 303 (6th Cir. 2016) (quoting *United States v. Bridgewater*, 606 F.3d 258, 260 (6th Cir. 2010)).

Rule 404(b) of the Federal Rules of Evidence generally prohibits the admission of evidence concerning a defendant's prior bad acts unless for specific purposes. *See* Fed. R. Evid. 404(b)(1); *see also Hruby*, 19 F.4th 966. However, Rule 414(a) provides an exception when the charged offense involves "child molestation." Fed. R. Evid. 414(a). "Child molestation" is defined, in part, as "any conduct prohibited by 18 U.S.C. chapter 110," which in turn prohibits knowingly receiving or distributing, using a computer, "any visual depiction" involving "a minor engaging in sexually explicit conduct." *See* Fed. R. Evid. 414(d)(2)(B); 18 U.S.C. § 2252(a)(2); *see also United States v. Libbey-Tipton*, 948 F.3d 694, 701 (6th Cir. 2020). Rule 414(a) states:

> In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant.

Fed. R. Evid. 414(a). However, such evidence is subject to analysis under Rule 403, which provides:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

*Id.* 403; *United States v. Cox*, 871 F.3d 479, 486 (6th Cir. 2017).

**A.**

We begin with England's Rule 403 argument that the district court abused its discretion by admitting Minor B's testimony because the testimony's probative value was substantially outweighed by its prejudicial effect.

"In the case of a Rule 403 analysis, we grant the district court 'very broad' discretion in making its determinations." *Libbey-Tipton*, 948 F.3d at 701 (quoting *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006)). "Under this standard, 'this court takes a maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect, and will hold that the district court erred only if the latter outweighs the former.'" *Id.* (quoting *United States v. Sassanelli*, 118 F.3d 495, 498 (6th Cir. 1997)). The probative value of the evidence of prior acts of child molestation in a case charging the same depends, in part, on "the similarity between the act in question and the prior act" and "the closeness in time between the acts." *Id.* The probative value must be analyzed "separately from the government's need for the evidence." *Id.*; *see also United States v. Stout*, 509 F.3d 796, 800 (6th Cir. 2007) ("[T]he need for the evidence does not make the evidence more likely to prove that which it is offered to prove. Probative value and need for the evidence are separate considerations that weigh in favor of admission under the Rule 403 balancing test.").

England first argues that "[p]ossessing child pornography and . . . attempting to touch a minor's genitals over his clothes are far from similar." Appellant Br. at 53 (citing *United States v.*

*Hough*, 385 F. App'x 535, 537 (6th Cir. 2010)). In *Hough*, we affirmed the district court's exclusion of two reports of child molestation, one conviction of child molestation, and a civil judgment of child molestation, from the trial of a defendant charged with possession and attempted receipt of child pornography. 385 F. App'x at 535–36. In holding that the prior child molestations were minimally probative, we reasoned:

> There are distinct dissimilarities [between the prior child molestations and the charged offenses], however, including the fact that the other acts involved physical contact, with no allegations of any documentation such as pictures or videos, whereas the charged offense is possession and attempted receipt of child pornography. A propensity to sexually abuse a child does not directly translate to a propensity to download child pornography.

*Id.* at 537.

But we rejected this same line of argument in *Libbey-Tipton*, stating that *Hough* is "an unpublished opinion that has no precedential value." 948 F.3d at 702. We also reasoned that Rule 414's emphasis on "*any other* child molestation" implied that "the prior acts do not need to be identical to be admitted." *Id.* We further noted that "the physical act and the subject matter of the child pornography are strikingly similar." *Id.* The same is true here. As the district court observed, "Minor B is the same age and sex as the overwhelming majority of the minors depicted in the child pornography in this case. Numerous images [found on England's laptop] involve older males touching a prepubescent minor's penis." R.200, PID 1632. The image underlying Count 3, for example, depicted "[a]n older nude male . . . straddled over [a] prepubescent male holding his penis with his right hand above the prepubescent male's penis and facing the prepubescent male's face." R.265, PID 2249. And, the laptop contained images associated with file names such as "7yo boy fully molested by uncle Tim" and "12yo boy with man." App. 25, 35. We agree with the district court that there is sufficient similarity between the charged offenses and England's alleged conduct with Minor B.

Next, England contends that the closeness in time between his alleged conduct with Minor B and the charged offenses does not weigh in favor of admission of Minor B's testimony. He asserts that the conduct may only have "occurred in the same general timeframe" and that Minor B's testimony on this point was inconsistent with his pre-trial statements. Appellant Br. at 55. Although the government does not address this argument in its brief, England does not explain why the acts were not sufficiently close in time or how Minor B's testimony was inconsistent with his statements before trial.

Finally, England argues that Minor B's testimony was not necessary to the government's case. In the proceedings below, the government had argued that Minor B's testimony was necessary to rebut England's anticipated defense that the child pornography found on the laptop was attributable to persons other than England. The district court agreed, and further found that the government had articulated a "significant need" for the evidence in order to "demonstrate [England]'s sexual interest in children—in particular young boys[.]" R.200, PID 1634.

On appeal, England notes that the government introduced other evidence showing that England had near-exclusive control and custody of the laptop, and also elicited testimony from a jailhouse informant that England admitted to viewing child pornography. The government responds simply that in *Libbey-Tipton*, this court held that evidence of the defendant's prior acts was necessary to rebut the argument that the child pornography attributed to the defendant was not his. "The same is true here," it asserts. Appellee Br. at 43. We disagree.

With respect to the defense that the child pornography could have been placed on the laptop by others, England asserted in his motion *in limine* that "there is already contradictory evidence in the record with some witnesses saying that anyone could have accessed [England]'s laptop and others saying the opposite." R.142, PID 1294. On this point, he argued that "other witnesses can

testify directly about this issue." *Id.* And, indeed, multiple witnesses testified on this subject at trial. For example, paramedic Jonathan Farmer testified that he never "observe[d] [England]'s laptop [in the lieutenants' office] without him there[.]" R.287, PID 2984. He further testified that he never personally saw anyone use the laptop assigned to England after April 2017. Christopher Scott Earl, a fire department employee, also testified that he never saw anybody other than England using the laptop and that England "used it in his office all the time. When he was in [the lieutenants' office], he was on it. When he's not, the door was shut and he was gone." R.288, PID 3252. Lieutenant Perry similarly testified that other than the one time he used England's laptop in England's presence, he never saw anyone else use the laptop and never saw the laptop lying around without England nearby. The record thus demonstrates that Minor B's testimony was not "necessary" to show that it was unlikely that the child pornography was placed on England's laptop by someone else.

Similarly, Minor B's testimony was not necessary to demonstrate England's sexual interest in young boys. Although in denying England's motion *in limine* the district court stated that it was "not aware of alternative sources of proof on this issue," R.200, PID 1634, the government had filed a notice that it planned to offer the testimony of "Cooperating Witness 1 (CW1), [who] will testify that he shared a jail cell with [England]" and that England "disclosed to CW1 details about the types of child pornography [England] enjoys, specifically once a child obtains too much pubic hair [England] loses interest," R.139, PID 1249–50. At trial, moreover, CW1 testified that England confided in him that "viewing or having child pornography" was "something that he regularly did" and that England typically viewed child pornography involving "[b]oys mostly. He said he liked them around the teenage years when they started to develop pubic hair." R.289, PID 3312–13.

On this record, Minor B's testimony was not "necessary" to the government's case-in-chief—either to rebut the anticipated defense that someone other than England placed the child pornography on the laptop, or to demonstrate England's interest in young boys—because adequate alternative sources of proof were available. *See Stout*, 509 F.3d at 800 (in prosecution for receipt and possession of child pornography, affirming exclusion of evidence that defendant surreptitiously took video of 14-year-old female neighbor when she showered, reasoning that other means of proof, such as ex-wife's testimony that she had discovered through internet search history that defendant was searching for child pornography, were available).

Nevertheless, because England has not sufficiently articulated why Minor B's testimony was not probative of the charged offenses, either with respect to the similarity of the conduct or the temporal proximity, and because necessity is only one factor, we conclude that the district court did not abuse its discretion in admitting Minor B's testimony. *Id.* at 800–01.

**B.**

England also argues that the district court lacked a sufficient basis to conclude that he engaged in the alleged conduct toward Minor B. He asserts that the district court determined the veracity of Minor B's allegations solely "through an out of court pretrial interview that was not subjected to cross-examination," which was insufficient to meet the preponderance-of-the-evidence standard for the admission of such evidence. Appellant Br. at 56. This argument is without merit.

"Rule 414(a) evidence, like other similar-acts evidence, 'is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" *Hruby*, 19 F.4th at 966–67 (quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988)). Under Rule 104(b), "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced

sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). "When examining conditional relevance, the trial court does *not* decide if the defendant committed the similar act or even if the similar act occurred." *Hruby*, 19 F.4th at 967. Rather, "the court only 'examines all the evidence in the case and decides whether the *jury* could reasonably find the conditional fact . . . by a preponderance of the evidence.'" *Id.* (quoting *Huddleston*, 485 U.S. at 690).

England contends that the district court's single out-of-court pretrial interview with Minor B to evaluate the veracity of his allegations was insufficient to establish an adequate basis to determine that England engaged in the alleged conduct by a preponderance of the evidence. However, we have held that a single witness's testimony can suffice for a reasonable jury to conclude that a defendant committed prior acts, even where there are "shortcomings in the testimony." *United States v. Matthews*, 440 F.3d 818, 828–29 (6th Cir. 2006) (single witness testimony sufficient despite "ambiguity" and "confusion" about the facts). The district court correctly stated the Rule 414 standard, and concluded that a reasonable jury could find that England engaged in the alleged conduct toward Minor B by a preponderance of the evidence, noting that the government had proffered evidence of such conduct through Minor B's forensic interview.

For these reasons, the district court did not abuse its discretion in concluding that a jury could find that England engaged in the alleged conduct toward Minor B by a preponderance of the evidence.

## C.

Finally, England argues that the district court erred in admitting Minor B's testimony because his conduct "d[id] not rise to the level of 'child molestation' as contemplated by any of the applicable federal statutes." Appellant Br. at 57. He argues that although he attempted to touch Minor B's genitals on two occasions, he was unsuccessful.

The district court did not plainly err in finding that England's alleged conduct toward Minor B constituted "child molestation."[2] Rule 414 defines "child molestation" as, among other things, "any conduct prohibited by 18 U.S.C. chapter 109A and committed with a child" and attempts to engage in such conduct. Fed. R. Evid. 414(d)(2)(A), (F). One category of conduct prohibited by chapter 109A is "abusive sexual contact," which includes violations of § 2241(c) "had the sexual contact been a sexual act." 18 U.S.C. § 2244(a)(5). Section 2241(c) concerns, among other acts, engaging "in a sexual act with a person who has not attained the age of 12 years." "Sexual acts" include "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." *Id.* § 2246(2)(D). Sexual contact, by comparison, extends the prohibition to intentional touching both "directly or through the clothing." *Id.* § 2246(3). Also included in the definition of child molestation is "contact between any part of the defendant's body—or an object—and a child's genitals or anus" and attempts to do the same. Fed. R. Evid. 414(d)(2)(C), (F).

Here, the government's notice stated that Minor B would testify that England touched Minor B's penis over his pants on multiple occasions, and that he also attempted unsuccessfully to put his hands down Minor B's pants. At trial, Minor B testified that England once asked him if he wanted to ride in a firetruck, and that when he sat in England's lap, "[o]ne [of England's] hand[s] was on the steering wheel and the other one was squeezing my bad spot." R.290, PID 3471. Minor B testified that when that happened, "I held my two hands over my pants so he

---

[2] England did not argue below that his alleged conduct toward Minor B did not constitute "other child molestation." Fed. R. Evid. 414(a). Rather, the thrust of his argument was that admission of Minor B's testimony would be unfairly prejudicial. And, during the hearing on the motion *in limine*, England's counsel expressly stated that "we're not really making a Rule 414 argument on Minor B, other than the fact that there is no conviction." R.283, PID 2603. England's counsel continued, "[s]o really, our argument on Minor B goes straight to Rule 403." *Id.* Accordingly, we review this issue for plain error. *See United States v. Vonner*, 516 F.3d 382, 388 (6th Cir. 2008) (en banc).

couldn't get in, and then I told him to stop." *Id.*, PID 3472. When asked whether England "[w]as . . . trying to put his hands in your pants[,]" Minor B answered affirmatively. *Id.* As the district court noted in applying a sentencing enhancement under U.S.S.G. § 2G2.2(b)(5), Minor B's testimony that England's lap "felt like a stick," R.292, PID 3838, is evidence of England's intent to gratify himself sexually. Accordingly, England's attempt to put his hands down Minor B's pants to touch Minor B's penis in order to gratify himself sexually violates the prohibition on abusive sexual contact set forth in 18 U.S.C. § 2244(a)(5), and therefore qualifies as admissible evidence of "child molestation" under Fed. R. Evid. 414(d)(2)(A). For the same reason, England's conduct qualifies as "attempt[s]" at making "contact between any part of the defendant's body— or an object—and a child's genitals or anus" under Federal Rules of Evidence 414(d)(2)(C) and (d)(2)(F).

Accordingly, the district court did not err in concluding that England's conduct toward Minor B constituted child molestation under Rule 414.

* * *

In sum, because district courts have "very broad" discretion in making evidentiary determinations, and because we must take "a maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect," *Libbey-Tipton*, 948 F.3d at 701 (quoting *Sassanelli*, 118 F.3d at 498), we conclude that the district court did not abuse its discretion in admitting the testimony of Minor B.

## IV.

We next turn to England's argument that the district court erred in denying his motion to dismiss Count 4 of the indictment. "This court reviews de novo a district court's denial of a motion to dismiss an indictment on the grounds of double jeopardy." *In re Ford*, 987 F.2d 334, 339 (6th

Cir. 1992); *see also United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008) ("Whether an indictment suffers from a problem of duplicity or multiplicity is a legal question that this Court reviews *de novo*.").

"'Multiplicity' is charging a single offense in more than one count in an indictment." *Swafford*, 512 F.3d at 844 (quoting *United States v. Lemons*, 941 F.2d 309, 317 (5th Cir. 1991)). "Multiplicity may result in a defendant being punished twice for the same crime or may unfairly suggest that more than one crime has been committed." *Id.* (internal citation omitted). We assess compliance with the double jeopardy clause by determining whether each offense requires proof of a fact that the other does not. *Id.*

England argues that the district court erred in denying his motion to dismiss Count 4 of the indictment because the images that served as the basis for that count were identical to the images he was convicted of receiving in Counts 1 and 2.[3] He further asserts that although Counts 1 and 2 specified the dates on which he received a particular image, "Count Four states he possessed child pornography over a range of dates, but fails to specify that these images are different from those in Count One and Two." Appellant Br. at 58–59.

The evidence presented at trial adequately supports the district court's determination that there was no double-jeopardy violation. The government's witness Nathaneal Ferrero, a forensic examiner, walked the jury through government trial Exhibit 8 to establish that the images underlying Counts 1 and 2 were located in the laptop's allocated space in cache files and retained all their metadata. The government's Exhibit 8, as explained by Ferrero, set forth the relevant metadata for these images, including the date on which they were received and their location in

---

[3] England does not assert a double jeopardy violation with respect to Count 3's charge of receipt of child pornography depicting "an approximately twelve (12) year old boy," as Count 4 charges possession of child pornography depicting "a prepubescent minor or a minor who had not attained 12 years of age." R.55, PID 296–97.

the laptop's files. The images underlying Count 4, in contrast, were taken from the laptop's unallocated space and did not have complete metadata. Exhibit 8 set forth, for a sample of these images, their date of last access, including images pre- and post-dating the dates of receipt for the images underlying Counts 1 and 2.

Additionally, the government's trial Exhibit 9 divided the images into separate sections corresponding to the different counts. Exhibit 9A comprised images underlying Counts 1 through 3, and Exhibit 9C contained a representative sample of images in the laptop's unallocated space, which served as the basis for Count 4. During the direct examination of FBI agent Thad Lambdin, the primary agent responsible for the investigation, the government walked Lambdin through the relevant portions of Exhibit 9:

> Q. Okay. And does this image correspond to Count 1 of the indictment?
> A. Yes.
> Q. If we go to page 2 of 9A, does this image correspond to Count 2 of the indictment?
> A. Yes, it does. And it is laid out the same way that I just explained.

R.289, PID 3381. By contrast, when prompted, Lambdin agreed that Exhibit "9C is a representative sample of the rest of the images." *Id.*, PID 3383. The government explained at sentencing that "Exhibit 9A[] had the very specific images that were laid out in Counts 1 through 3, as described in the indictment. And Government Trial Exhibit 9C had the representative sample of child pornography collection and *did not contain any of the images in 9A*, and so these were distinct images presented in 9C." R.292, PID 3818 (emphasis added). The record supports the conclusion that different images underlay the convictions under Counts 1, 2, and 4.

For this reason, the district court did not err in denying England's motion to dismiss Count 4 of the indictment.

**V.**

Finally, England argues that the district court erred in calculating his Guidelines imprisonment range and by imposing a substantively unreasonable sentence. "We review criminal sentences for procedural and substantive reasonableness under an abuse-of-discretion standard." *United States v. Sears*, 32 F.4th 569, 573 (6th Cir. 2022). "Procedural reasonableness requires the court to 'properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019) (quoting *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018)). Substantive reasonableness is concerned with whether a sentence is too short or too long and whether "the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *Id.* (quoting *Rayyan*, 885 F.3d at 442).

**A.**

England first argues that the district court erred in relying on his alleged conduct with Minor B to apply an enhancement under U.S.S.G. § 2G2.2(b)(5), which provides for a five-level enhancement "[i]f the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." U.S.S.G. § 2G2.2(b)(5). He contends that the district court erred in deeming Minor B's testimony credible and in determining that his alleged conduct constituted "sexual abuse" within the meaning of the Guidelines. These arguments lack merit.

England argues that Minor B lacked credibility because his testimony was both biased and inconsistent. Specifically, he contends that Minor B's parents "claimed very large monetary damages from the City of Middlesboro," that Minor B's father and grandfather did not immediately

report the alleged molestation to authorities, and that Minor B was unsure of his age and other details of the incident. Appellant Br. at 63. In addressing England's credibility argument with respect to a related enhancement, the district court stated that it "found Minor B very credible." R.292, PID 3832. It found Minor B "mature, sincere, [and] believable," and that his trial testimony "was almost lock-step consistent with his forensic examination." *Id.* The district court also noted that Minor B's testimony was corroborated by his father, who testified at trial that Minor B said to him, "Dad, I think Chris England's, I think he's a weirdo" and that "he tried to touch me." R.289, PID 3441.

We must uphold the district court's factual findings unless they are clearly erroneous, *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007), and when they "rest in large part on credibility determinations, we afford district courts even greater deference," *United States v. Oliver*, 397 F.3d 369, 374 (6th Cir. 2005) (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 707 (6th Cir. 1999)). Minor B's family's intent to sue the City of Middlesboro, his father's and grandfather's failure to immediately report the incident involving England, and Minor B's inability to remember his exact age when testifying, do not render Minor B's testimony inaccurate or untrustworthy. England provides no persuasive reason why this court should disturb the district court's factual findings and credibility determinations.

England also argues that the district court erred in concluding that his alleged conduct constituted "sexual abuse or exploitation of a minor" under U.S.S.G. § 2G2.2(b)(5). He contends that he was guilty of "sexual contact" at most, not an attempted "sexual act" such that the § 2G2.2(b)(5) sentencing enhancement would apply. This argument too is unavailing. The Guideline's commentary defines "sexual abuse or exploitation" to include an attempt to commit aggravated sexual abuse in violation of 18 U.S.C. § 2241(c). U.S.S.G. § 2G2.2, Application Note

1.  As discussed with respect to his Rule 414 argument, therefore, England's conduct—specifically, England's attempts to put his hands down Minor B's pants to touch his penis—constituted "sexual abuse or exploitation of a minor" within the meaning of this definition in Application Note 1 to U.S.S.G. § 2G2.2.

Apart from his credibility argument, England does not challenge the relevant factual findings on appeal. He challenges only the district court's determination that his alleged conduct constituted an attempted sexual act rather than simply sexual contact. But we find no error in the district court's conclusion that England engaged in attempted aggravated sexual abuse. "To prove an attempt, the government must show a defendant's intent to commit the proscribed criminal conduct together with the commission of an act that constitutes a substantial step towards commission of the proscribed criminal activity." *United States v. LaPointe*, 690 F.3d 434, 444 (6th Cir. 2012) (quoting *United States v. Shelton*, 30 F.3d 702, 705 (6th Cir. 1994)). "A substantial step must consist of 'objective acts that mark the defendant's conduct as criminal in nature.'" *United States v. Alebbini*, 979 F.3d 537, 546 (6th Cir. 2020) (quoting *United States v. Wesley*, 417 F.3d 612, 618–19 (6th Cir. 2005)). We consider "whether any reasonable person could find that the acts committed would corroborate the firmness of a defendant's criminal intent." *Id.* (quoting *Wesley*, 417 F.3d at 619).

At trial, in addition to his testimony that he once "sat in [England's] lap and then [England] backed the fire truck in, and then he start[ed] squeezing my bad spot," R.290, PID 3470, Minor B also testified that England attempted to put his hands down Minor B's pants:

Q. Okay. And when that happened, what did you do when he started squeezing your bad spot?

A. I held my two hands over my pants so he couldn't get in, and then I told him to stop.

Q. Okay. Tell me a little bit more about that. Why did you hold your hands at the top of your pants?

A. So he couldn't get under my pants.

Q. Was he trying to put his hands in your pants?

A. Yes.

Q. Was he able to get inside?

A. No.

*Id.*, PID 3472. The district court recounted this testimony and found that these actions constituted a substantial step in an attempt to commit aggravated sexual abuse. Minor B's testimony at trial provided adequate support for this finding. *See Alebbini*, 979 F.3d at 546. Further, the district court did not clearly err in finding that England intended to gratify his sexual desires as required by 18 U.S.C. § 2246(2)(D). And while aggravated sexual assault requires a defendant to cross state lines or to commit the act within the federal government's territorial jurisdiction, 18 U.S.C. § 2241(c), England does not raise any argument that "an attempt" to commit this "offense[]" within the meaning of the guideline required the government to show his intent to satisfy this jurisdictional element, U.S.S.G. § 2G2.2, Application Note 1.

Accordingly, the district court did not err in applying the five-level enhancement under U.S.S.G. § 2G2.2(b)(5).

**B.**

Next, England argues that the district court erred in failing to grant him a two-level reduction under U.S.S.G. § 2G2.2(b)(1), which provides that if U.S.S.G. § 2G2.2(a)(2)[4] is applicable, as it was here, the defendant is entitled to a two-level reduction if "the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and . . . the defendant did not intend to traffic in, or distribute, such material." U.S.S.G. § 2G2.2(b)(1). Specifically, he asserts, for the first time on appeal,[5] that the district court erred in concluding, based on his conduct with Minor B, that his conviction conduct was not limited to the receipt or solicitation of child pornography because such conduct "was not associated with any offense in the indictment." Appellant Br. at 66. The district court did not plainly err.

Whether a defendant's conduct was "limited to the receipt or solicitation" of child pornography begins with a "consider[ation] [of] what constitutes relevant conduct." *United States v. Hodge*, 805 F.3d 675, 678 (6th Cir. 2015). The Sentencing Guidelines define "relevant conduct" in part as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1)(A). To qualify as "relevant conduct" under § 1B1.3, conduct "must have constituted a criminal violation that could result in incarceration— either under federal or state law. Relevant conduct must also bear some logical relationship to the offense of conviction." *Hodge*, 805 F.3d at 680. In *Hodge*, which involved a prosecution for

---

[4] U.S.S.G. § 2G2.2(a)(2) provides that if the defendant is not convicted of an offense under 18 U.S.C. § 1466A(b), 2252(a)(4), 2252A(a)(5), or 2252A(a)(7), the defendant's base offense level is 22.

[5] In his sentencing memorandum, England argued that his alleged conduct toward Minor B did not "negate the application of the reduction," R.241, PID 1906, but he did so solely on the ground that Minor B's testimony was not credible. And at sentencing, counsel for England stated that "[i]f the Court finds [Minor B] credible, we would concede the application [of the guideline]. If the Court finds him not credible, then he should receive this two-level reduction." R.292, PID 3826–27.

receipt of child pornography, we affirmed the district court's denial of a two-level reduction under § 2G2.2(b)(1) based on the defendant's video voyeurism toward his fifteen-year-old stepdaughter, conduct for which he was never prosecuted. *Id.* at 677, 684. We reasoned that the defendant's voyeurism constituted "a federal child pornography attempt crime," thus satisfying the criminal violation requirement, and "resemble[d] the attempted production of child pornography," satisfying the logical relation requirement. *Id.* at 680.

England's alleged conduct toward Minor B satisfies the test set forth in *Hodge*. As explained above, England's conduct toward Minor B—although never charged—constitutes a "criminal violation that could result in incarceration," *Hodge*, 805 F.3d at 680, namely, attempted aggravated sexual abuse. Moreover, that conduct bears a logical relationship to his child-pornography convictions because both involve the sexual abuse and exploitation of minors.

The Tenth Circuit reached the same conclusion in *United States v. Neal*, 249 F.3d 1251 (10th Cir. 2001). Similar to the facts here, a minor's allegation that the defendant molested him led investigators to discover child pornography "in [the defendant's] files." *Id.* at 1261. In pleading guilty to possessing child pornography, the defendant "admitted" he possessed it "before and during the time that the molestation took place." *Id.* at 1260. In an alternative holding, the Tenth Circuit affirmed the district court's treatment of the molestation as "relevant conduct" in sentencing for the possession of child pornography. *Id.* at 1261 & n.8; *see also United States v. Bloom*, 661 F. App'x 1001, 1002, 1006 (11th Cir. 2016) (per curiam) (in prosecution for receipt and production of child pornography, holding that district court "was entitled to consider as relevant conduct at sentencing the undisputed fact that [defendant] engaged in a sexual act with a nine-year-old child in his care, even though that conduct was not an element of either offense of conviction" (citing U.S.S.G. § 1B1.3)). Because England's "criminal behavior related to his

sexual interest in children went beyond mere 'receipt or solicitation,'" *Hodge*, 805 F.3d at 684, the district court did not plainly err in refusing to grant England a two-level reduction under § 2G2.2(b)(1).

## C.

England also objects to the district court's application of a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. He argues that the evidence does not demonstrate that he ran CCleaner for the purpose of destroying evidence or thwarting an investigation into his offenses of conviction. We disagree.

Our cases have not settled on a standard of review for this enhancement. In some we have said that "[w]e review the district court's findings of fact for clear error, but determine de novo 'whether specific facts actually constitute an obstruction of justice.'" *United States v. Rios*, 830 F.3d 403, 438 (6th Cir. 2016) (quoting *United States v. Kamper*, 748 F.3d 728, 744 (6th Cir. 2014)); *see also United States v. Iossifov*, 45 F.4th 899, 922 (6th Cir. 2022). In others, we have suggested that we provide deferential review to the ultimate conclusion about whether the facts rise to the level of obstruction. *See United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019). We need not resolve this conflict in this case because it does not matter to the outcome. *See id.*

The enhancement for obstruction of justice applies:

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. Examples of conduct covered by the guideline include "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so." *Id.*, Application

Note 4(D). The enhancement may apply to conduct that preceded an investigation. As Application

Note 1 of the guideline explains:

> [t]his adjustment applies if the defendant's obstructive conduct (A) occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant.
>
> Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.

*Id.*, Application Note 1.

England argues that the district court erred in applying the obstruction-of-justice

enhancement because the evidence at trial showed that the CCleaner program was "not

administered on a uniform or purposeful basis" in order to delete evidence. Appellant Br. at 67–

68. He also asserts that the government failed to prove "what, if anything, was actually deleted on

the morning of the seizure," *id.* at 70, and that there was no evidence that he destroyed evidence

with knowledge that he was being investigated for a child pornography-related offense.

We disagree. As an initial matter, the district court did not clearly err in finding that

England ran CCleaner for the purpose of destroying evidence related to an investigation into his

offenses of conviction. Ferrero, the computer forensic examiner, testified that CCleaner was run

333 times on England's laptop, that it was not set to run automatically, and that the last run time

was between 9:48 a.m. and 9:53 a.m. on June 23, 2018, very soon after England was interviewed

at the police station regarding the incident at Walmart. And England's expert witness conceded

on cross-examination that "on June 23, 2018, sometime after someone ran CCleaner and the

computer was seized, all of the[] suspected pornography images [were] in deleted space[.]" R.291,

PID 3644. He further acknowledged that some of the child pornography images recovered from

England's laptop did not have dates attached to them because someone deleted them. Relying on this testimony, the district court concluded by a preponderance of the evidence that England had engaged in obstructive conduct. It stated:

> The exact time frames were presented as evidence and, again, it was just within a matter of minutes after concluding with the interview with local police concerning the Walmart incident when CCleaner erasing software was run on [England's] laptop.
>
> The defendant then left the fire station, immediately went home, and law enforcement requested the laptop from his father, the chief, and it was turned over two hours later and, again, I believe in the meantime CCleaner was run again.
>
> The forensic analysis of the laptop revealed that the child pornography was in both allocated, but mainly unallocated space. The images in the unallocated space had been deleted and only identified by law enforcement after extensive forensic analysis and the carving of the images.
>
> So the court finds by a preponderance of the evidence that the defendant destroyed and attempted to destroy evidence and obstruct the administration of justice in the investigation of this and other matters.

R.292, PID 3850–51. The district court's findings are not clearly erroneous. Nor was there error in its determination that these actions amounted to obstruction of justice. Indeed, the fact that CCleaner "was not administered on a uniform or purposeful basis so as to destroy evidence," Appellant Br. at 68, lends further support to the district court's conclusion that England took affirmative steps to destroy evidence relevant to the charged offenses by running the software.

That England purportedly deleted the pornography from his laptop without knowledge that he was being investigated for child pornography-related offenses does not change this result. Although no investigation into England's receipt or possession of child pornography had begun when he ran CCleaner, Application Note 1 to the guideline makes clear that the obstruction-of-justice enhancement may be based on conduct that preceded an investigation so long as that conduct "was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1, Application Note 1. Running CCleaner manually and

deleting files suggests that England's actions were purposeful and likely to thwart the investigation into his offenses of conviction. *E.g.*, R.288, PID 3182; *see also id.*, PID 3186 (testimony that deleting images obscures "where [they were] located and "how they were accessed"). England's conduct "occurred with respect to the investigation . . . [into] [his] instant offense of conviction" within the meaning of the guideline. U.S.S.G. § 3C1.1(A).

Accordingly, the district court did not err in applying the obstruction-of-justice sentencing enhancement.

**D.**

Finally, England argues that the district court imposed a substantively unreasonable sentence because it failed to consider his favorable character attributes in calculating his sentence and because his sentence created an unwarranted sentencing disparity with like offenders. We disagree.

We consider the "totality of the circumstances" in determining the substantive reasonableness of a sentence. *See United States v. Johnson*, 26 F.4th 726, 736 (6th Cir. 2022). "A sentence is substantively reasonable 'if it is proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a).'" *United States v. Moon*, 808 F.3d 1085, 1090 (6th Cir. 2015) (quoting *United States v. Robinson*, 778 F.3d 515, 519 (6th Cir. 2015)). It is substantively unreasonable "when the district court selects [the] sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Fields*, 763 F.3d 443, 455 (6th Cir. 2014) (quoting *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008)). Because England's "challenge here is to a sentence already below [the] Guidelines range," *United States v. Nunley*, 29 F.4th 824, 834 (6th

Cir. 2022), "rather than asking whether considerations based upon § 3553(a) are sufficiently compelling to justify the sentence," we ask "whether the considerations based upon § 3553(a) are so compelling as to necessitate a shorter sentence," *id.* (quoting *United States v. Kirchhof*, 505 F.3d 409, 414–15 (6th Cir. 2007)). "Although it is not impossible to succeed on a substantive-reasonableness challenge to a below-guidelines sentence, defendants who seek to do so bear a heavy burden." *Id.* (quoting *United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013)).

England has failed to carry that heavy burden. The district court explicitly considered England's mitigating circumstances in determining his sentence, noting, for example, that England had "lots of hardships in [his] family" and that he did not have a criminal history. R.292, PID 3884. It also reviewed thirty-one letters in England's support written by his friends and family. And in explaining its two-level downward variance, the district court again "note[d] that the defendant, Mr. England, has no criminal history. He also enjoys strong support from his family and friends." *Id.*, PID 3892. England's argument that the district court "failed to duly factor these" mitigating circumstances in determining his sentence, Appellant Br. at 74, is, therefore, belied by the record. Moreover, the fact that "the court did not weigh the factors raised by [England] in the manner that he would have liked to have had them weighed does not indicate that the court acted improperly or disregarded [England]'s arguments." *United States v. Houston*, 813 F.3d 282, 296 (6th Cir. 2016) (quoting *United States v. Hogan*, 458 F. App'x 498, 504 (6th Cir. 2012)).

With regard to sentencing disparities, England contends that most offenders with his conviction offenses and criminal history are sentenced to approximately 100 months' imprisonment. He also argues that by basing its sentencing decision in large part on his alleged conduct toward Minor B, the district court enhanced his sentence based on "another contact offense that was not the subject of his conviction conduct." Appellant Br. at 76. We disagree.

"The need to avoid unwarranted sentencing disparities sits at the heart of our substantive reasonableness review." *Johnson*, 26 F.4th at 740 (alteration omitted) (quoting *United States v. Lightning*, 835 F. App'x 38, 43 (6th Cir. 2020)). "Subsection 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007). Its purpose is "to ensure nationally uniform sentences among like offenders so as to leave room to depart downward for those defendants who are truly deserving of leniency." *Id.* at 624. "[S]entencing data released by the Sentencing Commission should serve as 'a starting point for district judges' to avoid unwarranted sentence disparities." *United States v. Perez-Rodriguez*, 960 F.3d 748, 756–57 (6th Cir. 2020) (quoting *United States v. Stock*, 685 F.3d 621, 629 n.6 (6th Cir. 2012)). But "national uniformity is generally taken into account by the Sentencing Guidelines, which 'are almost certainly the best indication of ordinary practice since most sentences are within the guidelines.'" *Simmons*, 501 F.3d at 626 (quoting *United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006)); *see also United States v. Hymes*, 19 F.4th 928, 935 (6th Cir. 2021) (stating that when a district court correctly calculates a defendant's Guidelines imprisonment range, it has "necessarily taken into account the need to avoid unwarranted sentence disparities, viewed nationally" (quoting *United States v. Houston*, 529 F.3d 743, 754 (6th Cir. 2008)). Whether the defendant's particular sentence creates unwarranted sentencing disparities is "simply one among many [factors] to consider when imposing a sentence." *Hymes*, 19 F.4th at 937.

The national average sentence imposed for child-pornography receipt offenses is 96 months and 68 months for possession offenses. *See* U.S. SENT'G COMM'N, FEDERAL SENTENCING OF CHILD PORNOGRAPHY NON-PRODUCTION OFFENSES at 20 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/

2021/20210629_Non-Production-CP.pdf. But England's case is not an "average case." England is unlike the "most common" possession and receipt offenders identified by the U.S. Sentencing Commission in that he did not receive a three-level reduction in the total offense level for acceptance of responsibility. England is also unlike the most common offenders because he received enhancements for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor, U.S.S.G. § 2G2(b)(5), and for obstructing justice, U.S.S.G. § 3C1.1. England also did not receive the two-level receipt-only reduction under § 2G2.2(b)(1). The combination of these scoring differences led to a significantly higher Guidelines range than the typical defendant in a child-pornography case.

At sentencing, the district court directly addressed England's disparity argument, stating that average sentencing statistics were "really not reflective of the facts in this case." R.292, PID 3888–89. It noted that a number of sentencing enhancements had been applied, and that "in an average case, those enhancements don't apply. Also in an average case, there is not hands-on touching like we had in this case and, in fact, you know, attempted sexual assault." *Id.*, PID 3889. The district court therefore gave due regard to sentencing disparities in determining England's sentence.

Separately, England argues that the district court erred in sentencing him by "focus[ing] primarily on Mr. England's alleged conduct with Minor B and how this incident placed him outside the norm of other offenders." Appellant Br. at 75. Although it is true that the district court considered England's alleged conduct toward Minor B in determining his sentence, this was not error. Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," U.S.S.G. § 1B1.3(a)(1)(A), and England's counsel acknowledged that his alleged conduct toward Minor B constituted

"relevant conduct," R.292, PID 3862. Moreover, England's conduct with Minor B is not all that the district court relied on in justifying England's long, but nevertheless below-Guidelines, sentence. It also stated that England's case was far from typical "because it involved pornography, images of children who were under 12 years old, sadistic and masochistic images; the hands-on touching, which applied the five-point enhancement." R.292, PID 3890. "So I think there is that that distinguishes this case," the court concluded. *Id.*

We agree and conclude that the district court did not abuse its discretion in sentencing England to 300 months' imprisonment.[6]

**VI.**

For the reasons set forth above, we **AFFIRM**.

---

[6] England states in a footnote in his appellate brief that "[t]he District Court relied [on] a combination of consecutive sentencing to arrive at the total effective sentence and, since a consecutive sentence is not required, this sentence reflects a sentence that exceeds the statutory maximum of each offense." Appellant Br. at 74 n.31. He makes no further argument on this point and did object to the consecutive sentences at the sentencing hearing.

MURPHY, Circuit Judge, concurring. I join Judge White's exhaustive opinion in full. I write to flag one issue with the way that the parties have presented this case to us. Among other issues, we must resolve whether Chief England of the Middlesboro Fire Department could consent to a law-enforcement seizure and search of the laptop assigned to his son, Robert Chris England. The parties treat Chief England's consent as if it were the consent of a private citizen who allowed the police to seize a family laptop used by the citizen's son in their private home. Our opinion explains that Chief England's "apparent authority" eliminated any Fourth Amendment problem with the seizure and search of this laptop under the traditional principles governing consent searches in that context. *See Illinois v. Rodriguez*, 497 U.S. 177, 183–89 (1990). But that fact pattern does not fit this case's facts. The police seized a government-owned laptop that was used for official fire-department business at the public fire station. Why shouldn't we analyze this case under the more limited Fourth Amendment protections that apply to the search or seizure of public property used by public employees? *See City of Ontario v. Quon*, 560 U.S. 746, 756–65 (2010); *O'Connor v. Ortega*, 480 U.S. 709, 714–26 (1987) (plurality opinion).

The Court has held that the Fourth Amendment does not categorically fall away in a public office. Public employees can have privacy rights implicating the Fourth Amendment in, say, their personal offices, *see O'Connor*, 560 U.S. at 714–19 (plurality opinion); *id.* at 729–32 (Scalia, J., concurring in the judgment), or electronic communications, *see Quon*, 560 U.S. at 758–60; *see also Mancusi v. DeForte*, 392 U.S. 364, 369–70 (1968). Yet the Supreme Court's cases have left open the operative test to decide whether an employee has such a privacy right. Some Justices have called for a case-by-case approach that looks to the "operational realities" of each workplace. *O'Connor*, 480 U.S. at 717 (plurality opinion). Others have advocated for a more categorical rule establishing privacy protections in an employee's personal spaces. *See id.* at 731–32 (Scalia, J.,

concurring in the judgment). Under the operational-realities approach, the Fourth Amendment's application here might depend on such things as whether the fire department had a policy that firefighters should not consider their internet browsing "private." *Cf. Quon*, 560 U.S. at 758; *Smith v. City of Pelham*, 2021 WL 5863412, at \*4 (11th Cir. Dec. 10, 2021); *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000). If not, perhaps England's near exclusive use of the laptop might be able to create a cognizable privacy interest under this approach. *Cf. United States v. Slanina*, 283 F.3d 670, 676–77 (5th Cir. 2002), *vacated on other grounds by* 537 U.S. 802 (2002).

Even still, just because a public employee has an expectation of privacy in public property does not necessarily prohibit a public employer from searching or seizing that property. The Fourth Amendment protects against only "*unreasonable* searches and seizures," U.S. Const. amend. IV (emphasis added), and the reasonableness of a warrantless search or seizure depends on the context in which it is undertaken. In that respect, a public employer's supervision of its employees and its property is a far different context than a police officer's intrusion on a private person and that person's private property. *See O'Connor*, 480 U.S. at 719–20 (plurality opinion); *see also Nat'l Treas. Emps. Union v. Von Raab*, 489 U.S. 656, 666 (1989). The Court has thus held that public employers do not always need a warrant or probable cause to search a public employee's office or equipment. *See Quon*, 560 U.S. at 761–62; *O'Connor*, 480 U.S. 722–23 (plurality opinion); *O'Connor*, 480 U.S. at 732 (Scalia, J., concurring in the judgment).

It has instead identified two more limited ground rules. For one, public employers have "wide latitude" to examine an employee's protected spaces for "work-related, noninvestigatory reasons." *O'Connor*, 480 U.S. at 723 (plurality opinion). So a supervisor can enter an employee's office to retrieve a paper document left on the employee's desk, *see id.*, or an electronic document left on the employee's computer, *see Lange v. McGinnis*, 644 F. App'x 672, 674 (6th Cir. 2016).

For another, public employers may access an employee's protected spaces to investigate "work-related misconduct" if they have a reasonable basis to believe that a search will disclose evidence of the misconduct and if the search's scope reasonably relates to the investigation's purposes. *See O'Connor*, 480 U.S. at 725–26 (plurality opinion); *see also Quon*, 560 U.S. at 761.

Under these rules, Chief England may have been able to search England's laptop *himself* as part of an investigation into his son's misconduct. Right after a police officer interrogated England for allegedly exposing himself to a young boy at Wal-Mart, England returned to the fire station and franticly used his computer in what another firefighter (rightly) suspected was an attempt to destroy evidence. Perhaps these facts offered the reasonable grounds necessary for Chief England to examine the laptop to determine whether his son had engaged in "work-related misconduct[.]" *O'Connor*, 480 U.S. at 726 (plurality opinion); *cf. Slanina*, 283 F.3d at 677–80; *Simons*, 206 F.3d at 399–400. After all, the City of Middlesboro's workplace policy stated that employees could face discipline for the personal use of city property as well as for off-duty actions that would discredit the city. Tr., R. 97, PageID 607, 613. And if Chief England could have searched the laptop under the Fourth Amendment rules governing public workplaces, I fail to see why he could not have consented to have the police search it. *See Walker v. Coffey*, 905 F.3d 138, 149 (3d Cir. 2018); *United States v. Ziegler*, 474 F.3d 1184, 1191–92 (9th Cir. 2007).

Because the parties have not briefed these public-employer issues, however, I would leave them for another day and resolve this case on apparent-authority grounds. I mention them merely to ensure that our opinion is not taken as an implicit repudiation of their application here.